UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | Case No. 2:26-cv-07124-SVW-RAO | Date | October 22, 2026 |
| Title | *Dominick Martin v. BB OpCo, LLC* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |
| Daniel Tamayo | N/A |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Scott J. Ferrell<br>Victoria C. Knowles | K. Scott Bays<br>Kristine R. Argentine<br>Majesty Eve L. Jala<br>Matthew C. Catalano |

**Proceedings:** ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION [17] AND DEFENDANT'S MOTION TO DISMISS AND STRIKE ALLEGATIONS [19]

## I. Introduction

This case involves allegedly misleading strike-through prices on the Brooks Brothers Website in violation of California's consumer protection and false advertising laws. Plaintiff, Dominick Martin, purchased a polo shirt at an advertised discount from Defendant, BB OpCo LLC ("Brooks Brothers"), but Plaintiff claims the discount was misleading, in violation of California law, because it advertised a former price that had not been the prevailing price for the product for more than three months. Now at the pleading stage, Plaintiff requests damages and equitable relief for himself and similarly situated persons in a proposed class action.

Before the Court are three motions from Defendant: (1) a motion to compel arbitration, and in the alternative (2) a motion to dismiss for failure to state a claim and (3) a motion to strike class allegations.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | Case No. 2:26-cv-07124-SVW-RAO | Date | October 22, 2026 |
|---|---|---|---|
| Title | *Dominick Martin v. BB OpCo, LLC* | | |

The Court DENIES Defendant's motions.

## II. Background

### A. The Arbitration Agreement

Defendant alleges Plaintiff agreed to an arbitration provision inside the Brooks Brothers Website's terms of use. Plaintiff never signed the agreement, but, according to Defendant, Plaintiff assented to the terms when he saw "terms" and "terms of use" hyperlinks on the website and continued to browse and checkout.

Plaintiff saw two kinds of hyperlinks: (1) a "terms of use" hyperlink at the bottom of every page and (2) a "terms" hyperlink at checkout.

Below is the first hyperlink at the bottom right of the Brooks Brothers homepage.




:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | Case No. 2:26-cv-07124-SVW-RAO | Date | October 22, 2026 |
| Title | *Dominick Martin v. BB OpCo, LLC* | | |

Plaintiff could have seen the "terms of use" hyperlink multiple times while browsing the Brooks Brothers Website and purchasing a polo shirt. The hyperlink is allegedly at the bottom of every page and can only be seen if the user scrolls to the bottom. If a user clicks the hyperlink, they can read the terms of use for the website, which includes an arbitration provision.

In terms of visual characteristics, the hyperlink itself is a dark navy blue against an off-white background and is not underlined. It is grouped in a line with six other hyperlinks to other legal notices as well as a Brooks Brothers copyright. The "terms of use" font size is comparable to the size for other links on the page, but it is noticeably smaller than the website's interactive elements and much of the text further up on the website.

Below is the second kind of hyperlink Plaintiff could have seen:




The hyperlinks in question are the "terms" below "sign up for emails" and "subscribe to text messages." Plaintiff allegedly could have seen these "terms" hyperlinks at checkout. Defendant does not

:

Initials of Preparer DTA

allege Plaintiff signed up for emails or subscribed to text messages, but Plaintiff allegedly scrolled past the hyperlinks or was on the same webpage as the hyperlinks while purchasing the polo shirt.

In terms of visual characteristics, the hyperlink itself is gray against a white background and underlined. It is placed at the end of explanations for checkboxes for signing up for emails and subscribing to text messages. The font size is comparable to the explanations but smaller than other text on the page.

**B. The Polo Shirt**

On January 10, 2025, Plaintiff bought a polo from the Brooks Brothers Website for $39.99. The strike-through reference price at the time of purchase was $89.50. ECF 12 at ¶ 11. Below is what the webpage looked like at the time.




Plaintiff alleges the Brooks Brothers Website and other online retailers had not sold the polo for $89.50 for at least three months before the January 10, 2025 purchase date. *Id.* at ¶¶ 15–22.

:

Initials of Preparer DTA

In terms of the advertisement's visual elements, the strike-through reference price is immediately next to the current price. The strike-through price does not have an explanation for what it describes or when it might have been the prevailing price for the product. Above the prices and the name of the shirt, there is a "Clearance" designation.

### C. Plaintiff's Class Allegations

Plaintiff identifies other products on the Brooks Brothers Website that have potentially misleading strike-through prices, *id.* at ¶¶ 24–27, and Plaintiff proposes the following class,

> "All persons who purchased one or more of Defendant's products at a purported discount from a higher reference price from Defendant's Website while in California from March 19, 2022 through the date a class is certified for primarily personal, family or household purposes, and not for resale,"

*Id.* at ¶ 54.

## III. Legal Standard

### A. Motion to Compel Arbitration

A "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction" is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Congress enacted the FAA "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22–25 (1983). The FAA reflects a "national policy favoring arbitration," *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (citation omitted), and the principal purpose of the FAA is

"to ensur[e] that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citation omitted)).

The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, while the FAA "requires courts to enforce [arbitration agreements] according to their terms ... they may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (citation omitted).

"Because the FAA mandates that 'district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed[,]' the FAA limits courts' involvement to 'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (citation omitted) (emphasis in original). If these two requirements are met, courts generally must compel arbitration. *See Farrow v. Fujitsu Am., Inc.*, 37 F. Supp. 3d 1115, 1119 (N.D. Cal. 2014).

"While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.' " *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002 1107 (N.D. Cal. 2011) (quotations omitted).

### B. Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not do. *Id.*; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). Thus, "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### C. Motion to Strike

Rule 12(f) permits a court to strike any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A statement in a complaint is immaterial if it "has no essential or important relationship to the claim for relief or the defenses being pleaded," and impertinent material means "statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal citations omitted), *rev'd on other grounds*, 510 U.S. 517 (1994).

## IV. Discussion

### A. Motion to Compel Arbitration

To determine whether an arbitration agreement is enforceable, the Court considers "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox*, 533 F.3d at 1119 (9th Cir. 2008).

In determining whether a valid arbitration agreement exists, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc v. Kaplan*, 514 U.S. 938, 944 (1995). Under California law, a contract requires (1) parties capable of contracting; (2) consent; (3) a lawful object; and (4) consideration. Cal. Civ. Code § 1550. Here, the parties contest whether the second element, consent, is satisfied. "For there to be knowing consent to the terms of a contract under California

law, there 'must be actual or constructive notice of the agreement and the parties must manifest mutual assent.'" *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *8 (N.D. Cal. Oct. 10, 2025) (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023)).

When internet arbitration agreements are analyzed, as in this case, the Ninth Circuit recognizes a two-pronged test: unless the movant can show actual knowledge, the contract is enforceable "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). The reasonably conspicuous notice prong is further broken down into two factors: (i) "the context of the transaction" and (ii) "the visual aspects of the notice." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024).

**i. The "Terms of Use" Hyperlinks at the Bottom of the Page Are Not Enforceable.**

Defendant argues Plaintiff consented to an arbitration agreement by browsing the Brooks Brothers Website while there was a "terms of use" hyperlink at the bottom of the page. The Court finds the hyperlinks do not provide reasonably conspicuous notice and they do not require a consumer to take an action that unambiguously manifests his or her assent.

**a. The "Terms of Use" Hyperlinks Do Not Provide Reasonably Conspicuous Notice.**

The Court finds the "Terms of Use" hyperlinks do not provide reasonably conspicuous notice, because the type of transaction at issue does not contemplate a continuing forward-looking relationship and the visual aspects of the hyperlinks do not ensure users would see the hyperlinks.

Context of the transaction. The principal question for the first "context of the transaction" subfactor is "whether the type of transaction 'contemplates entering into a continuing, forward-looking relationship' that would be governed by the terms and conditions." *Godun v. JustAnswer, LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (quoting *Keebaugh*, 100 F.4th at 1017). The Ninth Circuit and California courts focus on a number of facts in their analysis: (1) whether there was a "full registration process," *Oberstein*, 60 F.4th at 517 (quoting *Sellers v. JustAnswers*, 73 Cap. App. 5th 444, 480 (9th Cir. 2024)); (2) whether there is a "free trial," *id.*; (3) "whether a user enters 'credit card information,'" *Godun*, 135 F.4th at 710 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017)); and (4) "whether the user has downloaded an app on their phone," *id.*

In this case, purchasing a shirt from Brooks Brothers does not start a continuing relationship. Consumers can buy individual items on the website, like a shirt, without creating an account. Consumers just need to give their billing information for that transaction, and they make no promises to give or receive information in the future. While consumers could create a continuing relationship with Brooks Brothers, doing so is not necessary to purchase one item in the store.

Visual aspects. The question for this second subfactor is "whether an advisal is 'displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Id.* at 709 (quoting *Berman*, 30 F.4th at 856). California courts look at the totality of the circumstances, focusing on "the 'visual aspects of the notice' within the 'overall screen design.'" *Id.* (quoting *Keebaugh*, 100 F.4th at 1019). A plaintiff's familiarity with Internet agreements "has no bearing on whether [they] had constructive notice." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

In this case, the hyperlinks are buried on the website for at least five reasons: (1) they are placed at the bottom of the page and require scrolling to access, *see id.* at 1177 (links buried at the bottom); (2) the font is smaller than other important objects on the website, like the dropdown menu titles, discount alerts, sign up button, section tags, product titles, and banners, *see Berman*, 30 F.4th at 857 (small font); (3) the color and formatting does not suggest the words, "Terms of Use," are a hyperlink, *id.* (font color and formatting); (4) the words, "terms of use," with nothing more would not communicate to a reasonable average consumer that there is a contract, *see Long v. Provide Com., Inc.*, 245 Cal.App.4th 855, 867 ("the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | Case No. 2:26-cv-07124-SVW-RAO | Date | October 22, 2026 |
| Title | *Dominick Martin v. BB OpCo, LLC* | | |

phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public"); and (5) the hyperlinks are not in close proximity to any of the website's core interactive elements, like the products when browsing or the buttons that finalize a purchase during checkout, *see Nguyen*, 763 F.3d at 1177 (close proximity).




**b. The "Terms of Use" Hyperlinks Do Not Require a Consumer to Take an Action that Unambiguously Manifests His or Her Assent.**

The "terms of use" hyperlinks fail under the unambiguous assent prong on two independent grounds: (1) the hyperlinks do not require users to take any action to manifest assent except browse, and (2) the website does not explicitly advise consumers that browsing qualifies as an assent to the terms.

Required action. Under California law, agreements "'in which an internet user accepts a website's terms of use merely by browsing the site'" are called "browsewrap" agreements. *Keebaugh*, 100 F.4th at

:

Initials of Preparer DTA

1014 (quoting *Sellers*, 73 Cal.App.5th at 463). Browsewrap agreements have been consistently held unenforceable. *Id.*

In this case, the hyperlinks do not require users do anything to accept the terms except browse the website. Therefore, the hyperlinks are browsewrap.

Explicit advisement. Applying California law, consumers can only unambiguously manifest their assent to an Internet contract if they are "'explicitly advised that the act of clicking will constitute assent.'" *Godun*, 135 F.4th at 710–11 (quoting *Berman*, 30 F.4th at 857). "Explicit advisement generally looks like an explanatory clause, usually at the beginning of an advisal." *Godun*, 135 F.4th at 711.

In this case, the hyperlinks are not paired with explicit advisements.

**ii. The Hyperlinks at Checkout Are Not Enforceable.**

Defendant argues Plaintiff consented to an arbitration agreement by checking out while there were two "terms" hyperlinks next to optional checkboxes to subscribe to emails and text messages. The Court finds the hyperlinks at checkout do not provide reasonably conspicuous notice and they do not require a consumer to take an action that unambiguously manifests his or her assent.

**a. The Hyperlinks at Checkout Do Not Provide Reasonably Conspicuous Notice.**

The Court finds the "terms" hyperlinks at checkout do not provide reasonably conspicuous notice, because Plaintiff's transaction does not contemplate an ongoing forward-looking relationship and the visual aspects of the hyperlinks do not ensure consumers would notice the links at checkout.

Context of the transaction. The analysis described above for the "terms of use" hyperlinks apply with the same force here: if the consumer does not sign up for emails or subscribe to text messages, as is the case here, the transaction, buying a shirt, does not contemplate a forward-looking relationship. Brooks

Brothers does not allege Plaintiff checked any of the boxes to sign up or subscribe. So, while the advisals themselves contemplate consumers might want to create an ongoing relationship, the transaction in this case with this plaintiff did not.

<u>Visual aspects</u>. In the context of this case, where a consumer checked out without signing up for emails or subscribing to text messages, the hyperlinks are buried. They are buried for at least five reasons: (1) the font is smaller than other important objects at checkout, like the billing details, *see Berman*, 30 F.4th at 857 (small font); (2) they are gray and visually blend into the background, *id.* (font color and formatting); (3) the word, "terms," is not descriptive enough to let an average reasonable consumer know the link connects to a contract, *see Long*, 245 Cal.App.4th at 867 ("the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public"); (4) they are located at the end of multiple lines of text explaining what it means to "sign up for emails" or "subscribe to text messages," *Berman*, 30 F.4th at 857 (set apart); and (5) the explanations themselves suggest the "terms" links might only pertain to separate agreements regarding signing up for emails and subscribing to text messages: "you agree to receive emails" and "you agree to receive recurring […] text messages" before "view terms" would lead a reasonable consumer to believe those terms pertain to the agreement to receive emails and texts.

:

Initials of Preparer DTA




**b. The Hyperlinks at Checkout Do Not Require a Consumer to Take an Action that Unambiguously Manifests His or Her Assent.**

The hyperlinks at checkout fail under the unambiguous assent prong on two independent grounds: (1) the advisals require the consumer to take an action, checking boxes, but Defendant completed the transaction without taking that action, and (2) the explanations with the advisals suggest the "terms" has to do with the agreement to sign up for emails or subscribe to text messages, not the agreement to purchase the shirt.

Required action. In addition to the browsewrap agreement designation mentioned above, California courts also recognize "'clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh*, 100 F.4th at

1014 (quoting *Sellers*, 73 Cal.App.5th at 463). Relevant here, "'sign-in wrap' agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service." *Sellers*, 73 Cal.App.5th at 464. While sign-in wrap agreements are not presumptively unenforceable, like browsewrap agreements, they require "a textual notice indicating the user will be bound by the terms." *Sellers*, 73 Cal.App.5th at 471.

In this case, the hyperlinks at checkout function as browsewrap for the shirt transaction at issue. Plaintiff was not required to sign up for anything to purchase the shirt, and Defendant's theory is that Plaintiff browsing the checkout page qualified as assent to the "terms."

If Plaintiff were contesting the subscription service to emails or texts, then the hyperlinks at checkout could be sign-in wrap. Before consumers can get emails or texts, they must check the box to sign up and there is a notice indicating the user will be bound by terms. However, Plaintiff is not challenging the subscription service to emails or texts.

<u>Explicit advisement</u>. In this case, the explanations do not warn consumers that browsing or proceeding with checkout will qualify as agreeing to the hyperlinked terms.

### B. Motion to Dismiss

Plaintiff brings three causes of action: (1) violations of California's False Advertising Law (FAL), (2) violation of the Consumers Legal Remedies Act (CLRA), and (3) violation of the Unfair Competition Law (UCL). Plaintiff plausibly alleges all claims under all three causes of action.

#### i. Plaintiff Sufficiently Pleads Violations of California's False Advertising Law.

##### a. California Business and Professional Code § 17501

Cal. Bus. & Prof. Code § 17501 dictates, in relevant part,

> "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price […] within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement."

To plead a violation of § 17501, plaintiffs must provide sufficient facts to plausibly allege two things: (1) a reasonable consumer would have interpreted an advertised price as a "former price," *see Carvalho v. HP, Inc.*, 2022 WL 2290595 at *5 (N.D. Cal. 2022) (explaining how the reasonable consumer test applies to the price, not the advertisement as a whole); and (2) the advertised price was not the prevailing market price within three month preceding the publication of the advertisement. In addition, claims sounding in fraud under the California False Advertising Law, like this one, must be pled with particularity. *See Nunez v. Saks Inc.*, 771 Fed. App'x 401, 403 (9th Cir. 2019) (applying Fed. R. Civ. P. 9(b) to a § 17501 claim).

In this case, Plaintiff identified a strike-through reference price next to a discounted price, ECF 1 at ¶ 8, and used archived snapshots of the Brooks Brothers Website to show the store had not sold at the reference price within the past three months, *id.* at ¶¶ 9–10. In describing the reference price, Plaintiff explains who saw the price, what the price was, when he saw the price, where he saw the price, and how he saw the price. This is enough to plead false advertising with particularity under § 17501.

Defendant disagrees and argues the word, "CLEARANCE," prevents any reasonable consumer from being misled. According to Defendant, a clearance designation clarifies that an advertised strike-through price is not a recent former price for the product, and Defendant analogizes to *Hirlinger v. WP Co. LLC*, 2024 WL 2941630 (N.D. Cal. June 10, 2024).

In *Hirlinger*, the defendant sold an annual subscription to *The Washington Post* for $40. 2024 WL 2941630 at *1. At checkout, along with the $40 price, there was also a strike-through reference price of $120 with an explanation, "$40 for one year, then $120 every year thereafter." *Id.* The Northern District of California found no reasonable consumer would have thought the $120 strike-through price was a former price for the product because "the $120 figure clearly and unambiguously refers to the future renewal price for the subscription." *Id.* at *5.

:

Initials of Preparer DTA

The present case is not like *Hirlinger*. Here, the strike-through prices on clearance items are advertised as former prices for those items. Even if the Court accepts, for argument's sake, that a clearance designation suggests that a discount is permanent and, therefore, the former price might be old, the clearance designation does not "clearly, exactly and conspicuously" state "the date when the alleged former price did prevail" as California's False Advertising Law requires. Cal. Bus. & Prof. Code § 17501.

**b. California Business and Professional Code § 17500**

Cal. Bus. & Prof. Code § 17500 "is more general and applicable to any false or misleading statement" as compared with § 17501. *Calcagno v. Kipling Apparel Corp.*, 2024 WL 3261205 at *7 (S.D. Cal. July 1, 2024) (citing *California v. Superior Ct. (J.C. Penney Corp.)*, 246 Cal. Rptr. 3d 128, 141 (Cal. Ct. App. 2019) (§ 17501 "enhance[s] or supplement[s] § 17500" by identifying a "specific prohibition")). To plead a violation of § 17500, plaintiffs must provide sufficient facts to plausibly allege there was a false or misleading statement and explain how the statement was misleading. *See Lona's Lil Eats, LLC v. Doordash, Inc.*, 2021 U.S. Dist. LEXIS 8930 at *13 (N.D. Cal. Jan. 18, 2021) (describing the federal pleading standard as applied to § 17500).

In this case, Plaintiff identifies the strike-through price as misleading and explains how the price is misleading: it is an old former price at which the purchased product has not been selling for months. As discussed above, Plaintiff alleges these facts with particularity. Therefore, the § 17500 claim is sufficiently pled.

Defendant disagrees and argues that strike-through prices cannot be misleading statements about products because a price "does not constitute a representation or statement about the product" and analogizes to *Boris v. Wal-Mart Stores, Inc.,* 35 F. Supp. 3d 1163, 1169 (C.D. Cal. 2024).

In *Boris*, Wal-Mart sold two identical migraine medications at vastly different prices. *Id.* at 1165. The more expensive brand came in special red packaging and sold for two to three times the price of the cheaper brand. *Id.* The Western District of California found the price of the more expensive product was not deceptive in the meaning of § 17500 because current prices, on their own, are not statements about the product: "the price is simply the amount at which the merchant offers to sell the product." *Id.* at 1169.

The present case is not like *Boris*, because, unlike current prices, advertised former prices are "statement[s] […] concerning […] personal property." Cal. Bus. & Prof. Code § 17500. Advertised former prices communicate at least two things: (1) consumers were once willing to purchase the product at the former price and (2) the seller is providing a discount on the product. As the California Court of Appeals for the Second District explains, "§§ 17500 and 17501 have application 'in the so-called "comparative advertising" field,' which encompasses advertisements of an item's value or worth, and advertisements of an item's former selling price." *J.C. Penney Corp., Inc.*, 246 Cal. Rptr. 3d at 143 (quoting a 1957 Opinion of the Attorney General of California, 30 Ops. Cal.Atty.Gen. 127, 129 (1957)). In other words, while a current price just describes the merchant's offer, the former price makes a comparison between a current offer and the former prevailing market price.

**ii. Plaintiff Sufficiently Pleads a Violation of California's Consumers Legal Remedies Act.**

Cal. Civ. Code § 1770(a) lists unlawful methods, acts, or practices. § 1770(a)(13) identifies one such practice as "making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions." "The standards for determining whether a representation is misleading under the False Advertising Law apply equally to claims under the CLRA." *Colgan v. Leatherman Tool Grp., Inc.*, 38 Cal. Rptr. 3d 36, 46 (2006). "Conduct that is 'likely to mislead a reasonable consumer' thus violates the CLRA." *Id.* (quoting *Nagel v. Twin Lab'ys, Inc.*, 134 Cla. Rptr. 2d 420, 431 (2003) (finding the same misleading statements can violate the California's unfair competition law, false advertising law, and the CLRA)).

In this case, Plaintiff plausibly pleads with particularity that a reasonable consumer would believe the strike-through reference price is a former price and the reference price violates Cal. Bus. & Prof. Code § 17501 for being misleading. Therefore, Plaintiff sufficiently pleads a violation of the CLRA.

**iii. Plaintiff Sufficiently Pleads a Violation of the Unfair Competition Law.**

"Any violation of the false advertising law [...] necessarily violates the unfair competition law." *Comm. On Children's Television, Inc. v. Gen. Food Corp.*, 673 P.2d 660, 668 (1983).

As discussed above, Plaintiff sufficiently pleads a violation of the false advertising law. Therefore, Plaintiff also sufficiently pleads a violation of the unfair competition law.

**iv. Plaintiff Sufficiently Pleads Equitable Relief.**

In federal court, plaintiffs must have standing for every form of relief requested. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek"). Defendant argues Plaintiff does not have standing for injunctive relief because Plaintiff's prospective injury is not sufficiently imminent and nonspeculative. The Court finds Plaintiff, at this early stage, has pled an imminent and nonspeculative injury-in-fact, because he has established "a sufficient likelihood that he will again be wronged in a similar way." *Davidson v. Kimberly-Clark Corp.*, 899 F.3d 956, 967 (9th Cir. 2018).

The Ninth Circuit has found that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." *Davidson*, 889 F.3d at 968; *Clark v. Eddie Bauer LLC*, 2024 WL 177755 at *2 (9th Cir. 2024) (affirming the continued vitality of *Davidson* after *TransUnion*). So long as the plaintiff plausibly alleges they desire to purchase the challenged product, "a consumer's inability to rely on a representation made on a package [...] is an ongoing injury." *Davidson*, 889 F.3d at 961. Plaintiff's burden, at this time, is low, because "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may be sufficient," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

In this case, Plaintiff alleges he would consider purchasing more Brooks Brothers products if the company fixed its advertising. If Brooks Brothers does not change its advertising, there is no way to know, without looking at historical pricing, whether the advertised reference prices accurately reflect prevailing market prices. This is sufficient to establish standing. *See e.g.*, *Paya v. Macy's Inc.*, 793 F.Supp.3d 1201,

1210 (C.D. Cal. 2025) (finding allegations of a desire to shop and an inability to trust were sufficient to establish prospective standing).

### C. Motion to Strike

Defendant argues Plaintiff's proposed class is overbroad and not readily ascertainable. The Court finds that at the pleading stage Plaintiff's proposed class should not be stricken for being overbroad or unascertainable.

As noted at the last status conference on August 31, 2026, the Court expects certification of a class in this case might be particularly challenging. However, striking the allegations at this stage in the litigation would be premature.

#### i. Plaintiff's Proposed Class Is Not Overbroad.

A proposed class is fatally overbroad when it is drawn "so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012)). In false advertising cases, "the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012). If a proposed class is overbroad, district courts may strike class allegations as part of their "broad discretion to control the class certification process." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009). However, "'the better and more advisable practice […] is to afford the litigants an opportunity to present evidence'" after discovery that may cure the defect or show the class is maintainable. *Id.* (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977)).

Defendant argues Plaintiff drew the class too broadly for two reasons (1) the class includes persons who saw a higher reference price listed in places outside Defendant's website; and (2) the class includes

persons who purchased products without discounts being advertised at the time of purchase. These statements are factually untrue. Below is the class definition in the first amended complaint:

> "All persons who purchased one or more of Defendant's products at a purported discount from a higher reference price from Defendant's Website while in California from March 19, 2022 through the date a class is certified for primarily personal, family or household purposes, and not for resale."

ECF 12 at ¶ 54. The class definition only applies to persons who bought the products from Defendant's website "at a purported discount." The plain meaning of "at a purported discount" is that there was a discount at the time of purchase.

**ii. Ascertainability Is Not an Independent Requirement in the Ninth Circuit.**

There is a circuit split on whether ascertainability is an independent prerequisite, separate from Fed. R. Civ. P. 23, for class certification, and the Ninth Circuit has rejected ascertainability as an independent prerequisite. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017) ("protecting a defendant's due process rights does not necessitate an independent administrative feasibility requirement"; "there is no due process right to 'a cost-effective procedure for challenging every individual claim to class membership'" (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015))). After the Ninth Circuit's decision in *Briseno*, the key question in an ascertainability inquiry, whether "ascertaining class membership would require unmanageable individualized inquiry," *Xavier v. Philip Morris USA Inc.*, 787 F.Supp.2d 1075, 1089 (C.D. Cal. 2011), is addressed by analysis into Article III standing, definiteness, superiority, and predominance, *see e.g.*, *Mays v. Wal-Mart Stores, Inc.*, 330 F.R.D. 562, 577–78 (C.D. Cal. 2019) (analyzing standing when addressing ascertainability).

Therefore, to the extent Defendant challenges the class's ascertainability as an independent prerequisite, Defendant's challenge is without merit.

:

Initials of Preparer DTA

*In arguendo*, even if the Ninth Circuit did recognize ascertainability as an independent prerequisite, Plaintiff would satisfy the requirement at the pleading stage. Defendant argues the class definition's exclusion of resellers, limiting the class to only persons who purchased products "for primarily personal, family or household purposes, and not for resale," ECF 12 at ¶ 54, renders class members impossible to identify. As Defendant explains, a member's "primary" reason for purchasing a product is inherently subjective. If membership depends on subjective criteria, then a class action would be inappropriate because individualized fact-findings would burden the administration of the class action.

However, it is not inevitable that a subjective test is necessary to exclude resellers from the class. With the aid of discovery, Plaintiff may be able to fashion an objective test for ferreting out resellers using information like purchase histories and commercial addresses or other methods.

## V. Conclusion

For the foregoing reasons, the Court HEREBY DENIES Defendant's motions to compel arbitration, dismiss for failure to state a claim, and strike without prejudice.

**IT IS SO ORDERED.**

:

Initials of Preparer DTA